[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

———————————————

No. 21-10619

———————————————

CHABAD CHAYIL, INC.,

Plaintiff-Appellant,

*versus*

THE SCHOOL BOARD OF
MIAMI-DADE COUNTY, FLORIDA,
and MIAMI-DADE COUNTY, FLORIDA,
OFFICE OF INSPECTOR GENERAL,

Defendants-Appellees.

———————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-21084-RNS

———————————————

Before NEWSOM and MARCUS, Circuit Judges, and COVINGTON,* District Judge.

COVINGTON, District Judge:

In 2019, following a government investigation into an afterschool program run by Plaintiff Chabad Chayil, Inc., Defendant Miami-Dade County Public Schools ("MDCPS") barred Chabad from continuing to use its facilities. Chabad sued both MDCPS and the investigating authority—Miami-Dade County's Office of Inspector General ("OIG")—for alleged violations of its federal constitutional rights. The district court dismissed those claims with prejudice and without leave to amend, and Chabad appealed. Following careful consideration and oral argument, we affirm.

I

According to the amended complaint, Chabad is a non-profit organization that runs numerous programs for the Jewish community and wider community in Miami-Dade County. As part of its programming, Chabad operated a popular afterschool program—the Community Hebrew Afterschool Program ("CHAP")—from 2008 until the end of the 2018-19 school year. By the time it ceased operations in 2019, CHAP had grown to serve approximately 200 students at two locations, Aventura Waterways

---

* Honorable Virginia M. Covington, United States District Judge for the Middle District of Florida, sitting by designation.

K-8 ("Waterways K-8") and Virginia A. Boone Highland Oaks Elementary School ("Boone Elementary").

Chabad alleged that when it first saw the need for an afterschool program in 2008, its President, Rabbi Kievman, approached Dr. Martin Karp, a member of the MDCPS School Board. Chabad inquired as to how CHAP could utilize MDCPS facilities, and Dr. Karp directed the organization to Luis Bello, the principal of Waterways K-8. Bello procured forms from MDCPS's Facility Use Office and forwarded them to Chabad. "At Bello's direction," Chabad submitted the forms provided, and MDCPS approved Chabad's application for the 2008-09 school year. Chabad repeated the same process for the 2009-10 school year. Chabad offered the CHAP program at Waterways K-8 for the 2008-09 and the 2009-10 school years on a part-time basis.

After obtaining a funding grant, CHAP operated as a full-time program beginning in the 2010-11 school year and for every year thereafter. The year it obtained the funding, Chabad approached Bello about expanding CHAP into a full-time afterschool program, and Bello gave Chabad a different form to fill out: an MDCPS Application for Temporary Use of School Building Facilities of the Miami-Dade County Public Schools—Temporary Use Agreement ("TUA"). This form was different from the one CHAP previously filled out during the first two years of its program.

Under MDCPS policy, school administrators may approve the temporary use of school facilities for non-school educational,

civic, cultural, recreational, artistic, or charitable programs. The renter must submit a TUA and prepay rental charges unless the fee is waived by MDCPS officials. MDCPS may waive the rental fee, but only if the meeting or program is open to the public and offered free of charge.[1]

According to Chabad, MDCPS never communicated the fee waiver policy to Chabad and never informed Chabad that it could charge fees to its students and in turn pay rental charges to MDCPS. Similarly, Chabad alleged that the principals at Waterways K-8 and Boone Elementary requested the yearly fee waivers for CHAP, and Chabad was unaware that its use of MDCPS facilities free of charge was contingent upon CHAP offering its services for free. Nonetheless, Chabad received fee waivers each year until 2019.

Beginning in approximately 2017, the OIG began investigating Chabad in response to an anonymous complaint. The anonymous complaint read in pertinent part:

> School board member Dr. Martin Karp and his assistant, Gerald Bloomstein[,] have aided a religious organization named Chabad Chayil, which they are friendly with and participate in their programs by helping them gain access to using School [Board] [p]roperty for free under the claim that the organization does not collect any funds for its services

---

[1] The parties dispute whether MDCPS has an actual written policy on this point.

of aftercare. In fact, the organization . . . does charge [fees] for its services and has been fraudulently filling out paperwork submitted and accepted by the [S]chool [B]oard indicating that it does not collect funds and so gets to use the buildings for no money at all.

The OIG investigated the claims, with Chabad's cooperation, and in June 2019 the OIG sent Chabad a 37-page draft report of its investigation (the "Draft Report"). Chabad submitted a response to the Draft Report in July 2019, and the OIG published its Final Report in September 2019.

Chabad claims that both Reports were legally and factually inaccurate, biased, misguided, and prejudicial. Namely, Chabad takes issue with OIG's accusations that (1) Chabad made misrepresentations on its TUAs in order to gain free use of MDCPS facilities; (2) Dr. Karp and his chief of staff pressured MDCPS staff into approving Chabad's applications and fee waivers; (3) Chabad circumvented the School Board's process for having an afterschool program at a MDCPS facility; (4) Chabad improperly operated CHAP without the required state licensing; and (5) it violated state law by failing to do background checks on CHAP staff.

According to the amended complaint, MDCPS allowed Chabad to continue using school facilities for free during the pendency of the OIG's investigation. During this time, Chabad used the school board's online reservation system to reserve space at Waterways K-8 and Boone Elementary to operate CHAP for the

2019-20 school year. Chabad alleged that "one day before the start of the 2019-20 school year," MDCPS Chief Financial Officer Ron Steiger informed Chabad that, based on the Draft Report, it would not be permitted to use MDCPS facilities for the 2019-20 school year. Chabad objected to having its application denied on the basis of a Draft Report and before it had the chance to submit a response.

Chabad further alleged that "during this same period, Chabad Chayil's counsel encountered [MDCPS Superintendent Alberto Carvalho] at a charitable event and Carvalho assured him that MDCPS would work out an accommodation with Chabad Chayil." However, once the OIG issued its Final Report, MDCPS formally denied Chabad's online space reservation and "[d]espite numerous assurances by Carvalho that an accommodation for CHAP would be worked out, MDCPS, through Carvalho and Steiger[,] eventually told Chabad Chayil that it would never allow Chabad Chayil to use MDCPS facilities because the OIG's Final Report found that Chabad Chayil made misrepresentations on its TUAs."

Based upon these allegations, Chabad brought the following claims against MDCPS alone: (1) violation of the "Free Expression Clause of the First Amendment" pursuant to 42 U.S.C. § 1983 (Count II); (2) violation of various provisions of the Florida Constitution; and (3) violations of Florida state law. Chabad brought the following claims against both MDCPS and OIG pursuant to Section 1983: (1) violation of its First Amendment right to freely exercise its religion (Count I); (2) violation of its equal

protection rights under the Fourteenth Amendment (Count III); and (3) deprivation of its right to procedural due process under the Fourteenth Amendment (Count IV).[2] Chabad also sought declaratory and injunctive relief.

MDCPS and OIG filed separate motions to dismiss. The district court dismissed all four of Chabad's federal constitutional claims against MDCPS because it had failed to allege facts sufficiently demonstrating that any of the identified School Board officials had final policymaking authority as required to support liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The district court dismissed the Section 1983 Free Exercise claim against OIG for similar reasons, namely, for failure to allege facts establishing an official OIG policy or custom that would render OIG liable for the alleged constitutional violation. The district court further dismissed Chabad's Equal Protection and Due Process claims on the merits.

The district court also denied Chabad leave to further amend its complaint, finding Chabad's request for leave to amend "both procedurally deficient and lacking in substantive support." Finally, considering its dismissal of the federal claims, the district court refused to exercise supplemental jurisdiction over the state-law claims. Having dismissed the amended complaint in its entirety, the district court closed the case. This appeal followed.

---

[2] Chabad also brought a procedural due process claim based on the Florida Constitution against both Defendants.

## II

We review the grant of a motion to dismiss under Rule 12(b)(6) *de novo*, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff. *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004). We review a district court's denial of leave to amend a complaint for an abuse of discretion. *Coventry First, LLC v. McCarty*, 605 F.3d 865, 869 (11th Cir. 2010).

## III

### A.                    Claims against MDCPS

MDCPS may only be held liable where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under [Section] 1983." *Id.* at 694.

A plaintiff can establish municipal liability under *Monell* in three ways: (1) identifying an official policy; (2) identifying an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law; or (3) identifying a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional

rights. *See Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 966-68 (11th Cir. 2002). Chabad does not contend that MDCPS has an official policy or a widespread practice of constitutional violations, but rather that the single decision to prevent Chabad from using MDCPS facilities violated Chabad's constitutional rights. *See Martinez v. City of Opa-Locka*, 971 F.2d 708, 713 (11th Cir. 1992) ("[A] single decision by an official policymaker can establish the existence of an unconstitutional municipal policy."). We have set forth several guiding principles to evaluate whether the decision of a single official is sufficient to give rise to municipal liability, among them:

> (1) Municipalities have section 1983 liability only for acts officially sanctioned or ordered by the municipality. (2) Only those municipal officials who have final policymaking authority may subject the municipality to section 1983 liability for their actions. (3) The determination of whether or not a particular official has final policymaking authority is governed by state law, including valid local ordinances and regulations. (4) The challenged action must have been taken pursuant to a policy adopted by the official or officials responsible for making policy in that particular area of the city's business, as determined by state law.

*Id.* (internal citations and quotation marks omitted).

Here, Chabad alleges (1) that Superintendent Carvalho's "single . . . decision" to prevent it from using MDCPS's facilities for its after-school programs violated its constitutional rights and (2) that Superintendent Carvalho had the requisite "final policymaking authority" over school-facility usage. *See id.* With respect to the latter issue, Chabad's complaint says only that Carvalho was "responsible for the administration and management of MDCPS as set out in Fla. Stat. § 1001.51 and [was] a final decision maker of MDCPS." Doc. 27 ¶ 14. Neither that conclusory assertion nor the embedded statutory citation is sufficient to show that Carvalho had final policymaking authority over school-facility usage.

The standard that governs the *Monell* issue here is straightforward and uncontroversial: "[T]his Court's decisions have consistently recognized and given effect to the principle that a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." *Morro v. City of Birmingham*, 117 F.3d 508, 514 (11th Cir. 1997) (collecting cases). The question, therefore, is whether, as Chabad asserts, Carvalho had "unreviewable" authority over school property. Reply Br. at 5. Chabad offers no support for that conclusory assertion, and we can find none in the applicable Florida law. To the contrary, whatever property-related policymaking authority a school superintendent has is subject to the school board's "meaningful" review—and, accordingly, that it is not "final" for *Monell* purposes.

Nothing in either § 1001.51 or its neighboring provisions gives local school superintendents "final policymaking authority" with respect to school facilities. A review of the statutes confirms what courts applying Florida law have long concluded: "By statute, *the school board is the policy-making body for the school district*, while the superintendent is the chief executive officer of the school board and the chief administrator of the school district." *Greene v. School Bd. of Hamilton Cnty.*, 444 So.2d 500, 501 (Fla. Dist. Ct. App. 1984) (emphasis added); *see also Fernandez v. School Bd. of Miami-Dade Cnty., Fla.*, No. 15-21915-CIV, 2015 WL 9474616, at *4 (S.D. Fla. Dec. 29, 2015) (explaining that "the actual *School Board* itself          [is]          the          only          entity with final policymaking authority for the purposes of stating a claim for relief under *Monell*"); Fla. AGO 96-13 (Fla. A.G. Op.) (emphasizing *Greene*'s "policy-making body" language and generally recognizing the school board's preeminence in school-district governance).

Chabad cites only Fla. Stat. § 1001.51(4), which provides that, among a superintendent's other powers, he or she acts for the school board "as custodian of school property." Despite Chabad's reliance on § 1001.51(4), the quoted language suggests that the superintendent is effectively the school board's agent, and that it is the board—not the superintendent—that has ultimate (*i.e.*, "final") authority. *Cf. Board of Pub. Instruction for Nassau Cnty. v. Billings*, 15 Fla. 686 (1876) (holding that where a superintendent purchased land for school purposes without the school board's

consent and approval, the board had the authority to void the deal). Moreover, and in just the same vein, § 1001.51 states that in carrying out his duties, the superintendent "shall advise and counsel with the district school board." Fla. Stat. § 1001.51. That language indicates, at the very minimum, that the superintendent must discharge his responsibilities *in conjunction with the school board*—not alone.[3]

Nearly everything in Chapter 1001 of the Florida Statutes undermines Chabad's contention that Superintendent Carvalho has *Monell*-qualifying "final policymaking authority." Take, for instance, § 1001.33, which states that "[e]xcept as otherwise provided by law, all public schools conducted within the district shall be under the direction and control of the district school board with the district superintendent as executive officer." Fla. Stat. § 1001.33. Section 1001.33's language—particularly its recognition that the district is "under the direction and control" of the school board—strongly suggests that the board is ultimately in charge of school-district policy.

Working through Chapter 1001's provisions, we come next to § 1001.40. That section flatly states (among other things) that

---

[3] The final sentence of § 1001.51's preamble seems to confirm that understanding. That provision, which states that "[i]t shall be presumed that . . . the [superintendent's] recommendations, nominations, and proposals . . . [are] not contrary to the action taken by the district school board," Fla. Stat. § 1001.51, at the very least implies that the board retains the authority to reject the superintendent's "recommendations."

"[t]he governing body of each school district shall be a district school board." Fla. Stat. § 1001.40.

Next up, § 1001.41 provides that the "school board, after considering recommendations submitted by the district school superintendent, shall exercise [an enumerated list of] general powers." *Id.* § 1001.41. That language—referring to "recommendations" that the superintendent makes to the board—likewise indicates that it is in the board itself that final policymaking authority ultimately resides. Section 1001.49 is similar, repeatedly stating that the superintendent's role is to make "recommend[ations]" for the board's consideration and approval. *See, e.g., id.* at § 1001.49(2)–(5).

Moving on, §§ 1001.42 and 1001.43 are more specific—and seemingly in ways that bear on the particular issue in this case. The former says, among other things, that the school board "control[s] school property and convey[s] the title to real and personal property," and the latter that the board can "adopt policies providing for management of the physical campus and its environs …." *Id.* §§ 1001.42, 1001.43.

Based on the statutory scheme as a whole, it seems clear that the school board is ultimately in charge of school-district policy and that the superintendent acts, in effect, as the school board's agent—making recommendations to the board, executing policies that the board adopts, etc. It also seems clear that while the superintendent has day-to-day operational control—including "custodia[l]" control of school property under § 1001.51(4)—the school board retains the

ultimate authority to review and reverse any of the superintendent's decisions that it disapproves. Accordingly, it is the school board—not the superintendent—that has the "final policymaking authority" required under *Monell*.

The district court determined that Chabad failed to allege sufficient facts to allow the court to "infer that any of the superintendent's complained of actions fell within the contours" of his final policymaking authority. We agree.[4] Because Chabad failed to sufficiently allege the elements of *Monell* liability as to MDCPS, we affirm the district court's dismissal of Chabad's Section 1983 claims against MDCPS.

### B.          Claims against the OIG

By way of reminder, Chabad asserted Section 1983 claims against the OIG for (1) violating its right to free exercise of religion (the "Free Exercise claim"); (2) violating its right to equal protection when the OIG "singled it out for investigation" (the "Equal Protection claim"); and (3) failing to provide Chabad with procedural due process throughout the investigation (the "Due Process claim"). The district court dismissed the Free Exercise claim against OIG because Chabad failed to provide allegations that any complained-of free-exercise violation resulted from an official custom or policy of the OIG. It dismissed the Equal

---

[4] For the reasons explained in its dismissal order, the district court was correct to conclude that Chabad failed to sufficiently allege that any of the other named MDCPS officials exercised final policymaking authority for MDCPS.

Protection claim for failing to set forth facts establishing any valid comparators whom the OIG treated differently than Chabad. The district court dismissed Chabad's Due Process claim because (1) Chabad failed to sufficiently allege any concrete harm associated with its alleged reputational injury, and (2) even if it did allege such concrete harm, it failed to allege facts showing that the OIG was responsible for that harm.

As an initial matter, the parties hotly dispute whether the district court properly credited the contents of the OIG's Draft Report and Final Report, which Chabad attached to its amended complaint. It is well settled that "[i]n ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010). And "when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007).

A careful review of the district court's order, however, reveals that, in ruling on Chabad's claims against the OIG, it relied on the Reports only to establish the fact that the OIG initiated its investigation in response to an anonymous complaint about Chabad and to reference the accusations contained in that

16                    Opinion of the Court                    21-10619

anonymous complaint.[5]  The district court did not err in doing so because Chabad does not dispute either fact and, indeed, cites the substance of the anonymous complaint in its own pleading. We now address each of Chabad's Section 1983 claims against the OIG.

1.  Free Exercise Claim

The OIG, like MDCPS, is an agency of a political subdivision organized under the laws of the State of Florida. Chabad must therefore establish that the OIG's alleged constitutional violations resulted from an official policy, a custom so well settled it has the force of law, or the decision of an official with final policymaking authority. See Monell, 436 U.S. at 690-94; Cuesta, 285 F.3d at 966, 968.

On appeal, Chabad specifically disclaims "using some widespread policy standard to prove the OIG's municipal liability" but instead argues that "the institution of the OIG took unconstitutional actions." We agree with the district court that Chabad failed to allege facts demonstrating that any particular individual is a final policymaker for the OIG. That leaves the question of whether Chabad has sufficiently alleged an official

---

[5] True, the district court seemed to credit in its factual recitation certain other facts from the Reports. But any facts beyond the existence and content of the anonymous complaint did not impact the court's analysis. Moreover, in analyzing the claims on appeal, we have taken the allegations in the amended complaint as true and credited the Reports only to the extent that the OIG began its investigation of Chabad in 2017 in response to an anonymous complaint and the contents of that anonymous complaint.

policy or widespread custom of the OIG that would render it liable for the alleged violations of Chabad's right to freely exercise its religion. The answer is no.

The amended complaint's allegations about the OIG's investigation and Chabad's religion are limited to the following:

> Throughout its investigation, the OIG, in violation of the Free Exercise Clause, exhibited bias against Chabad Chayil based on its teaching of religion. The OIG pressured numerous people that it was interviewing to say that the fact that Chabad Chayil was teaching Jewish religious topics . . . was violating some policy, even though the OIG had no basis to believe that anything Chabad Chayil did was against any policy. . . .

> The OIG had no basis to believe that the religious orientation of CHAP violated any MDCPS policy. Yet, the OIG repeatedly pushed MDCPS administrators and others to say that there was something wrong with Chabad Chayil teaching religious topics in its CHAP program.

This is insufficient. The unspecified acts of unidentified OIG investigators in this single case do not plausibly allege an official policy of the OIG, or even a custom that rises to the force of law. *See Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (explaining that if plaintiffs cannot plead facts demonstrating an official policy, they must plead facts demonstrating a custom that is so "longstanding and widespread . . . [it] is deemed authorized by

the policymaking officials because they must have known about it but failed to stop it").

On appeal, Chabad now focuses on the Final Report as proof of "OIG's pervasive First Amendment violations." We do not consider arguments raised for the first time on appeal. *Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (noting our repeated holding that issues not raised before the district court and raised for the first time on appeal "will not be considered"). What's more, Chabad never explains how the Final Report violated its First Amendment rights nor even what those violations are.

The district court properly dismissed the Free Exercise claim against the OIG.

### 2. Equal Protection Claim

In its amended complaint, Chabad claims that OIG violated the Equal Protection Clause because it investigated Chabad "specifically because of its religious nature" and "[s]ingled [Chabad] out for investigation, when numerous other organizations . . . received fee waivers while charging fees."

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). As Chabad concedes, it proceeded here under a "class of one" equal protection claim, a "less-developed strand of equal protection jurisprudence." *Griffin Indus.*, 496 F.3d at 1200. In a "class of one"

claim, a plaintiff alleges not that it belongs to a protected class, but that it is the only entity being treated differently from all other similarly situated entities. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). In order to prevail, a plaintiff must show that it "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *PBT Real Est., LLC v. Town of Palm Beach*, 988 F.3d 1274, 1285 (11th Cir. 2021).

We apply the similarly situated requirement "with rigor." *Griffin Indus.*, 496 F.3d at 1207. The entities being compared "must be *prima facie* identical in all relevant respects." *PBT Real Est.*, 988 F.3d at 1285 (emphasis omitted). A plaintiff must ultimately show that it and any comparators are "similarly situated 'in light of all the factors that would be relevant to an objectively reasonable governmental decisionmaker.'" *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1275 (11th Cir. 2008) (quoting *Griffin Indus.*, 496 F.3d at 1207); *see also Griffin Indus.*, 496 F.3d at 1207 ("Accordingly, when plaintiffs in 'class of one' cases challenge the outcome of complex, multi-factored government decisionmaking processes, similarly situated entities must be very similar indeed." (internal quotation marks and citation omitted)).[6]

---

[6] Chabad argues for the first time on appeal that the complexity of the government decisionmaking process should have a direct bearing on the similarity showing. Chabad does not provide any legal authority for its argument and, in any event, we do not consider issues raised for the first time on appeal. *See Access Now,* 385 F.3d at 1331.

In analyzing Chabad's equal protection allegations, the district court identified a key problem—the OIG's investigation into Chabad was instigated by an anonymous complaint alleging that Chabad was improperly receiving fee waivers from MDCPS. Chabad fails to allege that any of the proposed comparators were also the subject of such a complaint. This fact alone clearly distinguishes Chabad from the other entities that allegedly collected monies while also receiving fee waivers from MDCPS. *See Lewis v. City of Union City,* 918 F.3d 1213, 1227 (11th Cir. 2019) ("[A] plaintiff and her comparators must be sufficiently similar, in an objective sense, that they cannot reasonably be distinguished." (citation and internal quotation marks omitted)); *Griffin Indus.*, 496 F.3d at 1203 (explaining that in evaluating "class of one" claims, courts must consider "the full variety of factors that an objectively reasonable governmental decisionmaker would have found relevant in making the challenged decision").

Thus, Chabad did not demonstrate that its comparators were similarly situated in all relevant respects. *See PBT Real Est.*, 988 F.3d at 1285. The district court correctly dismissed the Equal Protection claim against the OIG.

### 3. Due Process Claim

Chabad alleged in its amended complaint that the OIG thwarted its "liberty interest in its reputation by failing to provide Chabad Chayil with due process throughout its investigation." According to Chabad, the OIG refused to provide Chabad with an adequate opportunity to respond to the allegations in the Draft

Report and knowingly included false and defamatory statements in the Final Report that damaged Chabad's reputation.

The Supreme Court has held that injury to reputation, by itself, does not constitute the deprivation of a liberty or property interest protected under the Fourteenth Amendment. *Paul v. Davis,* 424 U.S. 693, 701–02, 712 (1976). The Court in *Paul* explained that, to invoke the procedural protections of the Due Process Clause, a plaintiff would need to establish more than a mere defamation claim. *Id.* at 706; *see also Siegert v. Gilley,* 500 U.S. 226, 233 (1991) ("Defamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation.").

Thus, to establish a valid claim for the deprivation of a liberty interest based on reputational harm, a plaintiff must satisfy what has come to be known as the "stigma-plus" test. *Behrens v. Regier*, 422 F.3d 1255, 1259 (11th Cir. 2005). Under this test, "a plaintiff claiming a deprivation based on defamation by the government must establish the fact of the defamation 'plus' the violation of some more tangible interest before the plaintiff is entitled to invoke the procedural protections of the Due Process Clause." *Cannon v. City of West Palm Beach,* 250 F.3d 1299, 1302 (11th Cir. 2001) (citing *Paul,* 424 U.S. at 701–02). Therefore, to establish "a liberty interest sufficient to implicate the [F]ourteenth [A]mendment safeguards, the individual must be not only stigmatized but also stigmatized in connection with a denial of a right or status previously recognized under state law."

*Behrens*, 422 F.3d at 1260; *see also Cypress Ins. Co. v. Clark,* 144 F.3d 1435, 1436 (11th Cir. 1998) ("This rule, labeled the 'stigma-plus' standard, requires a plaintiff to show that the government official's conduct deprived the plaintiff of a previously recognized property or liberty interest in addition to damaging the plaintiff's reputation."). Actionable deprivation of a property interest requires "a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). An "abstract need or desire" for, or a "unilateral expectation" of, a property interest is not enough. *Id.* That legal entitlement must be a "right or status [that] has been previously recognized and protected under state law." *Behrens*, 422 F.3d at 1261.

None of Chabad's arguments in support of its Due Process claim hold water. Chabad first points to *Marrero v. City of Hialeah*, 625 F.2d 499 (5th Cir. 1980), and a line of cases emanating from *Marrero* holding that allegations of harm to business reputation alone can sometimes rise to the level of a constitutional deprivation. Our Court, however, has expressly disclaimed that line of case law in light of *Siegert v. Gilley,* 500 U.S. 226 (1991). *See Cypress Ins. Co.*, 144 F.3d at 1438 ("The Supreme Court's message in *Siegert* is clear and unmistakable: Section 1983 did not make every tort committed by a state official a violation of constitutional rights. In particular, damages to a plaintiff's business reputation are only recoverable in a section 1983 action if those damages were incurred as a result of government action significantly altering the plaintiff's constitutionally recognized legal rights.").

Changing tactics, Chabad also argues that it had two protected property interests: (1) an informal agreement with MDCPS that Chabad would be allowed to use school facilities for CHAP until the conclusion of the OIG investigation; and (2) the right to have Chabad's applications considered by MDCPS. Neither provide Chabad a property right recognized under state law. The record reflects that, at the bottom of the TUA Chabad filled out each year, was language advising that "[b]efore this agreement becomes official it must bear the designated signatures" of both the principal of the school and the superintendent. And in Florida, contractual rights with a government agency require a written agreement that has been approved by the governmental entity. *See Pan–Am Tobacco Corp. v. Dep't of Corrs.*, 471 So. 2d 4, 5–6 (Fla. 1984) (recognizing an exception to sovereign immunity when state entities enter into contracts but cautioning that this waiver of immunity was "applicable only to suits on express, written contracts into which the state agency has statutory authority to enter"); *City of Orlando v. W. Orange Country Club, Inc.*, 9 So. 3d 1268, 1272–73 (Fla. 5th DCA 2009) (noting that waiver of sovereign immunity on contract claims would logically only apply if the written contract is "properly approved by or on behalf of the governmental entity sought to be held liable"). It is undisputed that Chabad does not have a signed, written agreement to use MDCPS facilities for the 2019-2020 school year or for any year thereafter. Nor has Chabad pointed to any legal authority providing that it has a "right" to have a local school board consider its applications.

24                    Opinion of the Court                    21-10619

Thus, Chabad has not demonstrated "stigma plus" a legal entitlement.

Moreover, we agree with the district court that even if Chabad had properly demonstrated stigma plus another concrete harm, it cannot show that the OIG caused that harm. To impose liability under Section 1983, the government entity's actions must be the "moving force" behind the deprivation of a constitutional right. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04 (1997); *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("[O]ur first inquiry in any case alleging municipal liability under [Section] 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."). A defendant's actions cannot be the moving force behind a violation where the actions of another, independent decisionmaker breaks the chain of causation. *Caruth v. Bentley*, 942 F.3d 1047, 1056 (11th Cir. 2019).

Here, the OIG's role is to conduct investigations and issue reports.[7] The OIG does not have the authority to refuse any group permission to use school board property–that power lies with MDCPS. Thus, even if the OIG did act in accordance with some

---

[7] The OIG provides inspector general services to MDCPS pursuant to an Interlocal Agreement between Miami-Dade County and the county's School Board. Pursuant to that agreement, the OIG possesses the authority to "investigate [MDCPS] affairs, including the power to review past, present, and proposed programs, accounts, records, contracts and transactions."

official policy or custom, that policy or custom did not cause Chabad's harm.

The district court properly dismissed Chabad's Due Process claim.

### C.                    Leave to Amend

Here, Chabad raised its request to file a second amended complaint at the end of its responses to the Defendants' motions to dismiss. This is procedurally improper. "[W]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." *Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1277 (11th Cir. 2018); *see also Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999) (explaining that a plaintiff wishing to amend its complaint must file a separate motion for leave to amend and either set forth the substance of the proposed amendment or attach a copy of the amended pleading). The district court was well within its discretion to deny Chabad's perfunctory request to further amend its complaint.

### IV

For the reasons stated, we conclude that the district court properly dismissed all of Chabad's Section 1983 claims against the MDCPS and OIG, and we affirm the dismissal of those claims without leave to amend.

**AFFIRMED.**