[DO NOT PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 23-11599

Non-Argument Calendar

_____

ORVIE MIZZELL-BULLOCK,

                    Plaintiff-Appellant,

*versus*

SEMINOLE COUNTY PUBLIC SCHOOLS,

                    Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:21-cv-01348-PGB-LHP

_____

Before WILLIAM PRYOR, Chief Judge, and JORDAN and LAGOA, Circuit Judges.

PER CURIAM:

Dr. Orvie Mizzell-Bullock appeals the summary judgment in favor of her former employer, Seminole County Public Schools, and against her complaint of race discrimination and retaliation. 42 U.S.C. §§ 1981, 1983. The district court ruled that Mizzell-Bullock failed to establish that the decisionmaker who recommended her termination possessed the final policymaking authority necessary to establish municipal liability against the school district. The district court also ruled that she failed to establish a causal connection between her alleged protected activity and adverse employment actions. We affirm.

From 2014 to 2019, Mizzell-Bullock, an African-American female, worked in the school district as an assistant principal of Seminole High School. In the summer of 2016, Mizzell-Bullock and her supervisor, senior principal Dr. Connie Collins, collaborated with Seminole State College to offer a new dual-enrollment course to high school students. Mizzell-Bullock asked the college dual-enrollment program coordinator, Dr. Angela Adame-Smith, whether Dr. Carolyn Taylor, a teacher at the high school, could teach the course. But Adame-Smith advised that Dr. Baboucar Jobe, Dean of Social Sciences, reviewed Taylor's credentials and determined that she lacked the proper degree to teach the course. Three days later, Mizzell-Bullock emailed Adame-Smith her résumé and asked

whether she had the credentials to co-teach with Taylor. Adame-Smith responded that Jobe "will not approve the co-teach for this class even though you have the credentials" and that "the co-teacher would have to be a faculty member from [the college]." Adame-Smith explained that no full-time faculty were available to co-teach with Taylor, as the faculty in this subject area were all adjunct professors. After Mizzell-Bullock stated that she did not understand why she could not teach the course if she had the proper credentials, Adame-Smith clarified that although the college would not approve Mizzell-Bullock co-teaching with non-college faculty, Mizzell-Bullock's résumé and transcripts appeared to meet the criteria to teach the course on her own. Mizzell-Bullock then submitted her employment and direct deposit information and became an adjunct professor with the college.

Despite Adame-Smith's instructions, Mizzell-Bullock proceeded to co-teach the course with Taylor. For the 2016, 2017, and 2018 school years, in addition to summer sessions, Mizzell-Bullock was the teacher of record for the course while Taylor taught the course. Mizzell-Bullock attested that she was responsible for the administrative functions and that Taylor taught and might have performed some administrative tasks. But Taylor understood Mizzell-Bullock's role to be the instructor of record, while her own role was to be "responsible for everything from A to Z," including teaching and grading the students, which required her to use Mizzell-Bullock's college log-in credentials. Taylor was not compensated, nor did she know that Mizzell-Bullock had received $15,336.31 for teaching the course.

On May 11, 2018, Mizzell-Bullock emailed Dr. Michael Gaudreau, the Executive Director of Secondary Education, and complained of unfair treatment. She stated that she wanted to combat false information about her, including that Collins gave her preferential treatment and allowed her "to do whatever [she] want[ed] to do." She stated that she stopped attending scheduling meetings because each time she attended "something is said that [she] ha[d] done," so she instead "quietly figure[d] things out on [her] own." She complained that she was not chosen for a lateral position at the Ninth Grade Center and that she had heard rumors of false statements that Gaudreau relied on in not selecting her for the lateral position. And she complained that she did not apply for a principalship because she knew she would not be selected. She stated that she felt the need to be alone and to limit what she said because "everything I do becomes a problem or concern."

Later that day, Gaudreau and Collins met with Mizzell-Bullock about her letter. Mizzell-Bullock testified that Gaudreau, who is white, yelled at her in the meeting, and that Collins, who is black, told her to never send a letter like that without her approval. She also testified that race was not mentioned in the meeting or the letter. After the meeting, Mizzell-Bullock emailed Gaudreau and told him that she felt better about all her complaints and would implement his suggestions to work on building better relationships and growing professionally.

Over a year later, on June 30, 2019, Mizzell-Bullock emailed Gaudreau about a meeting they had a week earlier about her

interest in a principalship. She stated that she disagreed with his feedback that "some people find [her] difficult to get along with," but she was resolved to change it and provided a list of areas for improvement. She asked him to consider her for committees and positions at other schools in the district. She later testified that they discussed a principalship at Hagerty High School, a school with a majority-white student population, and that Gaudreau asked her during her the panel interview how she would feel being the "face of Hagerty," which she felt was discriminatory because Hagerty had never had a black principal. She did not know if Gaudreau asked other candidates that question. Mizzell-Bullock applied for the position but did not receive it.

In July 2019, newly-hired assistant principal Cindy Nelson was creating a master schedule when she noticed a discrepancy between records listing Mizzell-Bullock as the instructor for the dual-enrollment course and others listing Taylor as the instructor. Nelson told Dr. Jordan Rodriguez, who replaced Collins as principal after she retired in June 2019, and he contacted the college and discovered that Mizzell-Bullock had received payments for teaching the course. Rodriguez also determined that Taylor had been teaching the course and that Taylor was unaware that Mizell-Bullock was being paid to teach the course. Rodriguez then contacted human resources for the school district. Based on concerns about misrepresentation and misallocation of funds, the school district's Office of Professional Standards decided to investigate.

On August 23, 2019, Mizzell-Bullock was placed on administrative leave pending the outcome of the investigation. Four days later, she emailed the school district's Equal Employment Opportunity and Equity Officer and complained of retaliation and discrimination based on her race and sex. She stated that her May 2018 letter to Gaudreau "stated that [she] felt discriminated against based on being an African American female," and that during a June 2019 meeting, after she requested feedback on why she did not receive a principalship, he told her to keep interviewing until she found the right "fit." She stated that one month after that meeting, a professional standards investigator asked to meet with her about an issue with the dual enrollment course, and three weeks later she was placed on paid administrative leave.

Between July and September 2019, the investigator interviewed Mizzell-Bullock, Rodriguez, Collins, Taylor, and Nelson. When interviewed, Mizzell-Bullock insisted that the college knew that she and Taylor were co-teaching the course. Collins told the investigator that she knew about the course but was not involved with communications with the college because Mizzell-Bullock had the designated contact. Collins mistakenly believed that the college approved the co-teaching arrangement based on Mizzell-Bullock's representations to her. Collins denied knowing that Mizzell-Bullock was paid for teaching the course and would have told her not to accept payment. Collins knew about co-teaching arrangements involving a college professor overseeing a teacher, but not a teacher overseeing another teacher.

The investigator also interviewed several college employees, including Adame-Smith and Jobe. Jobe stated that he was shocked to learn about the co-teaching arrangement with Taylor because Mizzell-Bullock was explicitly told it could not be done. He explained that although co-teaching arrangements had been approved where the oversight instructor was a college professor, the college had never permitted a co-teaching agreement where the oversight instructor was a school district employee. The investigator concluded that, based on the "overwhelming documentation," including Mizzell-Bullock's own statements, "there is sufficient substantiation to legally support that [] Mizzell-Bullock misle[]d and miscommunicated her direct involvement with the dual-enrollment class . . . and subsequent financial compensation received for 'teaching' the course as believed by [the college]." The investigator also concluded that her actions "appear to rise to the level of fraudulent activity, and in direct violation of district policies . . . ."

On October 22, 2019, Dr. Walter Griffin, the superintendent, informed Mizzell-Bullock that he had reviewed the investigative report and determined that her actions constituted misconduct and met the criteria for suspension and dismissal. Griffin stated that he intended to recommend that she be suspended without pay at the November 19, 2019, school board meeting, and he intended to recommend her termination at the December 18, 2019, school board meeting. He advised that she had the right to appear at these public meetings and to present any relevant information "prior to a decision being made by the School Board." He further advised

that she was entitled to file a written request for a formal administrative hearing, Fla. Stat. § 120.57.

On October 28, 2019, Mizzell-Bullock's attorney requested a formal hearing. But four days later, Mizzell-Bullock resigned in lieu of termination. After the school district notified the Florida Department of Education about the investigation, the Department determined that probable cause existed to sanction her. In 2021, Mizzell-Bullock entered into a settlement agreement with the Department and accepted a letter of reprimand, two years of probation, and a $750 fine.

Mizzell-Bullock sued the school district for race discrimination and retaliation. 42 U.S.C. §§ 1981, 1983. She alleged that the school district terminated her based on false allegations of fraud and that other "non-African American Administrators also co-taught in the same manner" but were not accused of fraud or terminated. She alleged that she was retaliated against for engaging in protected activity because she was terminated after she complained about discriminatory treatment.

The school district moved for summary judgment, which the district court granted. The district court ruled that Mizzell-Bullock's claim of race discrimination failed because the decisionmakers involved in the events leading to her resignation lacked the policymaking authority necessary to subject the school district to municipal liability. The district court also ruled that Mizzell-Bullock failed to exhaust her administrative remedies by not pursuing a hearing. And the district court ruled that her retaliation claim failed

because, regardless of whether her May 2018 letter to Gaudreau was protected activity because it did not reference race, the letter was too temporally attenuated from the investigation and termination recommendation over a year later. And it determined that the June 2019 meeting was not protected activity because her general inquiry for feedback, without more, failed to put the school district on notice of potential discrimination.

We review a summary judgment *de novo* and view the evidence in Mizzell-Bullock's favor. *Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 832 (11th Cir. 2021). Summary judgment is appropriate, and constitutional in civil rights cases, when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 919–20 (11th Cir. 2018).

Section 1981 is enforceable against a municipality through section 1983 and prohibits "intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022); *Webster v. Fulton Cnty., Ga.*, 283 F.3d 1254, 1256 (11th Cir. 2022); 42 U.S.C. § 1981. Claims of race discrimination and retaliation under section 1981 in the employment context are governed by the same framework as claims under Title VII of the Civil Rights Act of 1964. *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020); *Jenkins*, 26 F.4th at 1249. The Equal Protection Clause of the Fourteenth Amendment prohibits race

discrimination in public employment. *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018).

A school district is not subject to vicarious liability under section 1983 for violations of federal civil rights by its employees. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733–36 (1989). Instead, its liability must be based on a policy or custom. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978). A plaintiff can establish *Monell* liability by identifying an official policy, an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law, or a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights. *See Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty., Fla.*, 48 F.4th 1222, 1229 (11th Cir. 2022). Municipal liability for the actions of a decisionmaker "attaches only where the decisionmaker possesses *final* authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S 469, 497 (1986).

The district court did not err in granting summary judgment against Mizzell-Bullock's claim of racial discrimination. She offers no argument that purported-decisionmakers Griffin or Gaudreau had final policymaking authority for the school district, nor could she. Florida law does not provide local school superintendents final policymaking authority regarding employment decisions because, "[b]y statute, the school board is the policy-making body for the school district, while the superintendent is the chief executive officer of the school board and the chief administrator of the school

district." *Chabad Chayil*, 48 F.4th at 1230 (quoting *Greene v. Sch. Bd. of Hamilton Cnty.*, 444 So. 2d 500, 501 (Fla. Dist. Ct. App. 1984)).

Instead, Mizzell-Bullock argues that the district court failed to consider her evidence that supported the inference that the school district had a widespread, longstanding practice of discriminating against black individuals. She cites a consent decree between the school district and the United States entered in 1970 for operating an unlawfully segregated school system, but in 2006, the supervising court declared the district unitary and released it from further oversight. And Mizzell-Bullock's own failure to be promoted is insufficient to establish an "unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law," *see id.* at 1229, especially in the light of her admitting that she knew of several black principals within the school district, including Collins. Mizzell-Bullock failed to establish the school district's liability under *Monell*.

The district court also did not err in granting summary judgment against Mizzell-Bullock's claim of retaliation because she failed to establish that "the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). To establish a claim of retaliation, Mizzell-Bullock "must prove that she engaged in statutorily protected activity, that she suffered an adverse action, and that the adverse action was causally related to the protected activity." *Jefferson*, 891 F.3d at 924. As to causation, Mizzell-Bullock must prove

that had she not complained to Gaudreau, she would not have been investigated or recommended for termination. *See id.*

Mizzell-Bullock failed to present evidence sufficient to create a genuine issue of material fact about whether her complaint to and request for feedback from Gaudreau caused her to be investigated for fraud and recommended for termination. Even assuming her 2018 letter and 2019 meeting with Gaudreau addressing her interest in principalships and belief that she was unfairly passed over for other positions constituted protected activity, she did not allege or argue that Gaudreau caused or influenced Nelson to discover and report the record discrepancies to Rodriguez or that Gaudreau influenced the school district to open an investigation into her conduct with the dual-enrollment course. Nor is there any allegation that Griffin knew about Mizzell-Bullock's letter or meeting with Gaudreau before deciding to recommend her termination based on the findings of misconduct in the investigative report. Although Mizzell-Bullock formally complained about discrimination and retaliation to the equal employment opportunity officer after the investigation began, she did not argue that this formal complaint was causally linked to her recommended termination. *See Nassar*, 570 U.S. at 352.

We **AFFIRM** the summary judgment in favor of the school district.