[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-12991

_____

ADVANCE TRUST & LIFE ESCROW SERVICES, LTA,
As Securities Intermediary for Life partners
Position Holder Trust, on behalf of itself
and all others similarly situated,

                                                                 Plaintiff,

WORTH JOHNSON,

                                                        Plaintiff-Appellant,

*versus*

PROTECTIVE LIFE INSURANCE COMPANY,

                                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:18-cv-01290-MHH

_____

Before GRANT, ABUDU, and HULL, Circuit Judges.

HULL, Circuit Judge:

This class action involves a dispute over a life insurance policy issued to Plaintiff Worth Johnson ("Johnson") by Defendant Protective Life Insurance Company ("Protective") in South Carolina. While the procedural history is complicated, Johnson is now the sole remaining named plaintiff. Johnson brought on his behalf and others' the second amended complaint (the "complaint"), which alleges only a breach of contract claim under the policy.

The district court granted Protective's motion for judgment on the pleadings, concluding Protective did not breach its insurance contract as a matter of law. The primary issues on appeal concern the interpretation of the policy under South Carolina law. We begin by setting forth the complaint's allegations and the policy's relevant terms.

## I.    POLICY TERMS

In 1988, Protective issued a universal life insurance policy (the "policy") to Johnson in the face amount of $100,000. Johnson's policy conferred a death benefit with a savings or investment component, known as the "account value" or "policy value." The

savings component allows policies to be a tax-advantaged savings vehicle, earning interest on the policy value.  Here is how it works.

## A.    Net Premium

In a schedule, the policy sets Johnson's premiums at $900 per year.   The policyholder is permitted to pay premiums more frequently or in greater sums.  The policy then permits Protective to deduct "expense charges" from the premium, which yields a "net premium."  Johnson's policy lists these "expense charges":

> The percentage of premium expense charge is 5.00% of each premium payment.

> The monthly expense charge per $1000 (which applies during the first 12 policy months) is $ .00.

> The monthly expense charge per $1000 of increase (which applies during the first 12 policy months following an increase) is $ .26.

> The monthly administrative charge is $4.00.

(Font altered.)  In this regard, the policy defines "Net Premium" as the "premium payment less the percentage of premium expense charges shown in the Policy Schedule."   Johnson does not challenge Protective's calculation of the "expense charges" or the net premium.

## B.    Policy Value

The policy also permits Protective to make monthly deductions from the net premium, which yields the "Policy Value."

And the Policy Value is the money that accrues interest at a guaranteed interest rate set in the policy. It is through this process that the investment component of Johnson's policy grows in value. The Policy Value increases each month by one month's interest less the monthly deduction.

## C.    Monthly Deduction for Cost of Insurance

In turn, the policy defines the "Monthly Deduction" from the net premium. This monthly deduction "is the sum of the following four items," which are listed as:

> (1) The cost of insurance and the cost of additional benefits provided by riders for the policy month.

> (2) The monthly expense charge applicable to the Initial Face Amount. This charge applies only the first 12 policy months. . . .

> (3) The monthly expense charge applicable to any increase in face amount. This charge applies only to the first 12 policy months following the day on which an increase becomes effective. . . .

> (4) The Monthly Administrative Charge shown in the Policy Schedule.

(Emphasis added.) Johnson does not challenge items 2-4 (the monthly expense and administrative charges).

Johnson does contest item 1, the "cost of insurance" charge. The formula for that charge states:

The cost of insurance is determined at the end of each policy month as follows:

(1) divide the death benefit at the beginning of the policy month by the sum of 1 plus the guaranteed interest rate;

(2) reduce the result by the amount of policy value (prior to deducting the cost of insurance) at the beginning of the policy month;

(3) multiply the difference by the cost of insurance rate as described in the Cost of Insurance Rates section.

(Emphasis added.)  Johnson submits that "[u]nder this formula, a lower COI rate directly translates to a lower monthly COI charge." The only part of this formula in dispute is the cost of insurance *rate* (the "COI rate").

## D.    COI Rates

Johnson's policy has three main sections about the COI rate. His policy initially has a "Table of Guaranteed Maximum Insurance Rates" for each "attained age" from age 0 to age 94.  (Font altered.) Johnson was 43 when he purchased his policy in 1988.  His Table's guaranteed maximum monthly COI rate was 0.322 for his age of 43.

As Johnson grew older, his Table's listed COI rate generally increased.  By age 65, his Table shows a monthly COI rate of 2.122, over a 500% increase.  Johnson's Class Period begins on August 13,

2012.  We thus list the monthly COI rates after that date, which increased from 2.543 at age 67 in 2012 to 5.912 at age 76 in 2021—a 132% increase:

TABLE OF GUARANTEED MAXIMUM
INSURANCE RATES

MONTHLY RATE PER $1,000 EXCLUDING
RIDERS

. . .

| [YEAR] | [JOHNSON'S] ATTAINED AGE | RATE |
|--------|--------------------------|------|
| [2012] | 67 | 2.543 |
| [2013] | 68 | 2.773 |
| [2014] | 69 | 3.023 |
| [2015] | 70 | 3.303 |
| [2016] | 71 | 3.621 |
| [2017] | 72 | 3.986 |
| [2018] | 73 | 4.405 |
| [2019] | 74 | 4.872 |
| [2020] | 75 | 5.377 |
| [2021] | 76 | 5.912 |

Johnson does not challenge the Table's monthly COI rate scale. Later on, his policy states that the guaranteed maximum COI rates

"are equal to the 1980 CSO male and female mortality rates as applicable, adjusted to reflect [the insured's] underwriting class." (Font altered.)  Other than this Table, Johnson's policy does not contain any other COI rate scale.

Instead, Johnson contends that insurers, like Protective, "typically create an internal table of projected, non-guaranteed COI rates," and "when a policy is issued, an insured is 'assigned' to an initial COI rate table or scale that lays out a set of COI rates that cover the life of the insured."  Johnson represents that "[t]his initial COI table is not shared with the [insured] owner."  We refer to Protective's internal set of monthly rates covering the insured's life as Protective's "internal COI rate scale."

Johnson does not allege what rates Protective chose in its internal COI rate scale at inception in 1988 to cover his life.  Rather, Johnson's main complaint is that Protective never changed and redetermined its internal COI rate scale "a single time" during the Class Period that began on August 13, 2012, even though nationwide mortality rates had declined during that period.

Notably though, Johnson does not allege that Protective used an internal COI rate scale with rates that *exceeded* the guaranteed maximum rate.  And he does not claim on appeal that Protective breached its contract by using a COI rate scale that exceeded the guaranteed maximum rate.

Johnson's policy also contains two other COI rate sections. One section, entitled "Cost of Insurance Rates," states:

The <u>monthly cost of insurance rate is based on sex, attained age, and rate class of the Insured and on the policy year</u>. Attained age means age nearest birthday on the prior policy anniversary. <u>Monthly cost of insurance rates will be determined by us, based on our expectations as to future mortality experience</u>. <u>Any change</u> in the monthly cost of insurance rates will be on a uniform basis for insureds of the same class such as age, sex, rate class, and policy year. However, <u>the cost of insurance rates will not be greater than those in the Table of Guaranteed Maximum Insurance Rates</u>, shown in the Policy Schedule.

(Emphasis added.) Another section, entitled "Non-Dividend Paying," states:

This policy does not pay dividends and does not share in our surplus or profits. <u>Any change in insurance rates</u> or interest rates will be prospective and <u>will be subject to our future expectations as to mortality</u> and interest.

(Emphasis added.) The parties dispute the meaning of the above policy terms. We thus set forth their contentions and the contract issues on appeal.[1]

---

[1] Other plaintiffs and other Protective policies were originally part of this case. One policy included an endorsement that is *not* in Johnson's policy.

## II.     CONTRACT INTERPRETATION ISSUES

Although Protective's internal monthly COI rate scale never exceeded the Table's guaranteed maximum monthly rates, Johnson claims the policy contractually obligated Protective to reassess, redetermine, and reduce its internal COI rates when by 2012 nationwide mortality had improved.

Specifically, Johnson's complaint alleges that Protective breached its contract because: (1) the policy's language required Protective to reassess and redetermine its COI rates based on *exclusively* "improved mortality expectations and experience"; (2) nationwide mortality rates improved at 1% per year during the Class Period; (3) Protective thus must have "enjoyed significantly improved mortality experience and expectations"; but (4) Protective never redetermined COI rates "a single time" and wrongly continued to use its initial COI rate scale that considered other factors, including its expenses and lapse rates. His complaint also contains an alternative breach of contract theory: Protective did elect to redetermine and actually change its monthly COI rates during the Class Period, but wrongfully ignored its expectations as

---

> In the "Cost of Insurance Rates" section in the Policy <u>to which this endorsement is attached</u>, we state that monthly cost of insurance rates will be determined by us, based on our expectations as to future mortality experience. . . .
>
> Any change in our scale of cost of insurance rates will be based <u>solely</u> on our expectations as to future mortality experience.

(Emphasis added.)  This endorsement is not relevant because this case now involves only Johnson's policy.

to future mortality experience. Johnson complains that his "monthly mortality charges have increased from $124.61 in 2012 to $285.90 in 2019" and his "monthly COI rates have increased by more than 100%."

Protective responds that Johnson's complaint fails to state a breach of contract claim because: (1) the policy does not impose a contractual duty requiring that Protective reassess and redetermine its COI rates "based on" exclusively its "expectations as to future mortality experience"; (2) the policy does not preclude Protective from using its internal COI rate scale assigned to cover Johnson's life until age 94, as long as Protective does not exceed the guaranteed maximum monthly COI rates in the policy's Table; and (3) the policy does not preclude Protective from considering other factors impacting its COI rates.

This appeal presents these contract interpretation issues. First, after setting at inception its internal COI rate scale to cover Johnson's life, did Protective have a contractual duty to reassess and redetermine that COI rate scale during the Class Period?

Second, even if Protective had a contractual duty to reassess and redetermine its COI rate scale, whether the policy (1) requires Protective to redetermine its COI rate based on *exclusively* its "expectations as to future mortality experience" and (2) precludes Protective from considering any other factors.

And third, whether Protective could ignore its expectations as to future mortality when it chose or elected voluntarily to reassess and redetermine its COI rates.

### III.    PRECEDENT ABOUT COI RATES

The parties agree that South Carolina law governs the interpretation of Johnson's policy.  *See Bah. Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012) ("If the parties litigate the case under the assumption that a certain law applies, we will assume that that law applies.").  The parties, however, do not cite, and we have not located, a South Carolina appellate court decision involving a life insurance policy with COI rates.

Yet, our Court and two other circuits have interpreted universal life policies with COI rates.  *See Anderson v. Wilco Life Ins. Co.*, 17 F.4th 1339, 1340-41 (11th Cir. 2021) (applying Georgia law); *Slam Dunk I, LLC v. Conn. Gen. Life Ins. Co.,* 853 F. App'x 451, 452 (11th Cir. 2021) (unpublished) (applying Florida law); *Norem v. Lincoln Benefit Life Co.,* 737 F.3d 1145, 1147-49 (7th Cir. 2013) (applying Illinois law); *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 761 (8th Cir. 2020) (applying Missouri law).  We review these decisions before turning to South Carolina law.

### A.    *Anderson v. Wilco Life Ins. Co.* (**11th Cir. 2021**)

In *Anderson v. Wilco Life Insurance Co.*, the policy referenced: (1) an "[a]ctual monthly" COI rate; (2) a "guaranteed monthly" COI rate; and (3) a "current monthly" COI rate.  17 F.4th at 1340-43.  How our Court used rules of contract construction to interpret the COI rate terms is instructive.

Similar to Protective's Table, Wilco's Table of guaranteed COI rates listed the attained age and the maximum possible COI rate, which generally increased each year.  *Id.* at 1343.  The dispute

involved the paragraph below that Table, that said "[a]ctual monthly" COI rates "will be determined . . . based on the policy cost factors described in your policy," as follows:

> The cost of insurance rates shown above are based on the Commissioner's 1980 standard ordinary male mortality table, age last birthday. <u>Actual monthly cost of insurance rates will be determined by the company based on the policy cost factors described in your policy.</u> However, the actual cost of insurance rates will not be greater than those shown above.

*Id.* (emphasis added and font altered). Wilco's policy also had a "Cost of Insurance" section with a formula for the monthly COI *charge* that included a multiplier for the monthly COI rate. *Id.*

Wilco's COI Rate section then differentiated between "the guaranteed" and "the current" monthly COI rates:

> The <u>guaranteed monthly cost of insurance rates for the policy are based on the insured's sex, attained age and premium class on the date of issue</u>. Attained age means age on the prior policy anniversary except when this policy is issued when it means age last birthday prior to policy date. These rates are shown on a Policy Data Page.

> <u>Current monthly cost of insurance rates will be determined by the Company</u>. The current monthly cost of insurance rates will not be greater than the guaranteed monthly cost of insurance rates which are listed on a Policy Data Page.

*Id.* at 1344 (emphasis added). Even though her policy said the "current monthly" COI rate "will be determined by the Company," the plaintiff focused on the paragraph below the COI rate Table, which said the "actual monthly" COI rates "will be determined by the Company based on the policy cost factors described in your policy." *Id.* at 1343-45 (font altered).

The *Wilco* plaintiff argued (1) the only "cost factors described in [the] policy" were those associated with the guaranteed monthly COI rate, which were "sex, attained age, and premium class" and (2) therefore, "the policy required Wilco to base her current monthly rate" also "on her age, sex, and premium class." *Id.* at 1341, 1344-45. Wilco countered that its policy unambiguously gave it "discretion to set the current monthly rate provided that the amount [did] not exceed the guaranteed monthly rate." *Id.* at 1345.

In affirming the dismissal of plaintiff's complaint, this Court held that under Georgia law, the policy "unambiguously gives Wilco the discretion to set [plaintiff's] current monthly rate, so long as that rate does not exceed the guaranteed monthly rate." *Id.* at 1346. We acknowledged that the plaintiff stressed that the policy— *i.e.*, the paragraph under the Table—provided that the "[a]ctual monthly" COI rate "will be determined by the company based on the policy cost factors described in your policy." *Id.* at 1347 (quotation marks omitted). However, we pointed out that "the policy never mentions policy cost factors in conjunction with the current monthly rate." *Id.* The only factors mentioned in the

policy—the insured's "sex, attained age, and premium class"—relate to the guaranteed monthly COI rate. *Id.*

Despite this sentence—that "[a]ctual monthly" COI rates "will be determined based on the policy cost factors described in your policy"—the *Wilco* Court concluded the policy language was not ambiguous. *Id.* at 1348-49.  Citing Georgia law, we explained that: "[e]ven a policy which is susceptible to two reasonable meanings is not ambiguous if the trial court can resolve the conflicting interpretations by applying the rules of contract construction."  *Id.* at 1348 (quotation marks omitted and alterations adopted).  Applying those rules, the *Wilco* Court reasoned that "the specific provision about the current monthly rate"—*i.e.,* "the current monthly rate is determined by the company, with no mention of factors"—controlled to the extent it was inconsistent with the paragraph about the "[a]ctual monthly" COI rate under the Table, stating it "will be determined by the Company based on to-be-described policy cost factors." *Id.* at 1347.

We also rejected the plaintiff's claims that (1) the policy's use of "based on" was reasonably susceptible to an exclusivity interpretation and (2) the cost factors—sex, attained age, premium class—in the guaranteed-rate sentence could be grafted on the current monthly rate.  *Id.*  We found plaintiff's argument "untenable" because (1) it would mean the guaranteed/current monthly rates "would be calculated in the exact same way," (2) "it destroys the guaranteed/current monthly rate distinction," and

(3) it would render the phrase in the COI rate section—"will be determined by the Company"—"superfluous." *Id.* at 1348-49.

When read as a whole, the policy demonstrated that "Wilco was required to calculate[] Anderson's guaranteed monthly rate based on her age, sex, and premium class, but that this rate was distinct from the current monthly rate, which Wilco had discretion to set at any level, so long as it did not exceed the guaranteed monthly rate." *Id.* at 1346-47.

**B.    *Slam Dunk v. Conn. Gen. Life Ins. Co.* (11th Cir. 2021)**

Our Court has addressed another universal life policy with language quite similar to Protective's. In *Slam Dunk I, LLC v. Connecticut General Life Insurance Co.*, the plaintiff's policy stated the monthly COI rates "are determined by [the insurer] based on its expectations as to future mortality experience."[2]  853 F. App'x at 452-53. The full COI rate section, however, stated:

> The Monthly Cost of Insurance Rates are based on the Insured's Attained Age, the type of benefit, the Class of Insured and whether premiums for that Insured are paid directly to [Connecticut General] or through payroll deductions. The Monthly Cost of Insurance Rates are determined by [Connecticut General] based on its expectations as to future mortality experience. Adjustment in the Monthly

---

[2] Unpublished opinions, like *Slam Dunk*, "are not precedential, so they do not bind us . . . to any degree." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1346 (11th Cir. 2022) (citing 11th Cir. R. 36-2). We discuss *Slam Dunk* only because the parties' appellate briefs heavily focus on it.

> Cost of Insurance Rates may be made by [Connecticut General] from time to time, but not more than once a year, and will apply to Insureds of the same class. Under no circumstance will the Monthly Cost of Insurance Rates for Life Insurance ever be greater than those shown in the Table of Guaranteed Maximum Life Insurance Rates. Such guaranteed maximum rates are based on the Commissioners 1980 Extended Term Table (age last birthday) and 4% effective annual interest.

*Id.* at 452 (emphasis added).

Our Court affirmed the dismissal of the plaintiff's complaint and rejected "a reading of the [] policies that focuses only [on] one sentence to the exclusion of all others." *Id.* at 454. "We must read the contract as a whole and cannot sever the single sentence highlighted by [the plaintiff] from the remainder of the COI provision." *Id.* While one sentence "mentions future mortality experience as a basis for establishing the COI rate," the "immediately preceding sentence" establishes that "the COI rates are also based on 'the Insured's Attained Age, the type of benefit, the Class of the Insured and whether premiums for that Insured are paid directly to [Connecticut General] or through payroll deductions." *Id.* We reasoned that a reading of the policy that required monthly COI rates to be *exclusively* based on the insurer's expected future mortality experience would ignore the immediately preceding sentence. *Id.*

We also reasoned that "[n]othing about the plain and ordinary meaning of the phrase 'based on' connotes exclusivity," and "nothing about it implies the list that follows is exhaustive." *Id.* at 455. This Court pointed out that "[h]aving been used twice to refer to different factors, the phrase 'based on' cannot connote exclusivity without leading to an absurd or internally inconsistent result." *Id.* We therefore "decline[d] to adopt Slam Dunk's proposed interpretation because to do so would rewrite the [] policies." *Id.* We ruled that this policy interpretation was "most consistent with Florida contract law." *Id.*

Our *Slam Dunk* decision also relied on the Seventh Circuit's *Norem* decision, which we discuss.

### C.    *Norem v. Lincoln Benefit Life Co.* (7th Cir. 2013)

In *Norem v. Lincoln Benefit Life Co.*, the plaintiff asserted that the defendant Lincoln (1) was obligated to calculate its COI rate "based on the insured's sex, issue age, policy year, and payment class" and (2) breached its contract by considering other factors, including expected policy lapse rates, agent commissions, and anticipated death benefit costs. 737 F.3d at 1147-48. The policy value had a monthly cost of insurance deduction, calculated as follows:

> 1. Divide the death benefit as of the prior monthly deduction day by 1.003273739 [;] 2. Subtract the policy value as of that prior monthly deduction day less the policy fee and less the cost of insurance of any benefit riders attached to this policy; 3. Multiply the results by the current cost of insurance rate divided

by 1,000. <u>The cost of insurance rate is based on the insured's sex, issue age, policy year, and payment class. The rates will be determined by us, but they will never be more than the guaranteed rates shown on Page 5.</u>

*Id.* at 1147 n.2 (alterations in original) (emphasis added).

Affirming summary judgment for the defendant Lincoln, the Seventh Circuit held that the plain and ordinary meaning of the phrase "based on" does not imply "exclusivity." *Id.* at 1150. The Seventh Circuit first noted that the policy did not define the phrase "based on." *Id.* at 1149. Next, the Court turned to Merriam-Webster's definition of the word "base": "(1) 'a main ingredient;' (2) 'a supporting or carrying ingredient;' (3) 'the fundamental part of something.'" *Id.* (quoting Merriam-Webster's Collegiate Dictionary, 101 (11th ed. 2007)). The Court stated that "[o]ther definitions are in accord: (1) '[s]omething on which a thing stands or by which it is supported;' or (2) '[t]he principal ingredient, the fundamental element.'" *Id.* (alterations in original) (quoting Shorter Oxford English Dictionary Vol. I, 192 (6th ed. 2007)).

The Seventh Circuit concluded that none of these definitions supported plaintiff Norem's proposed interpretation—that "base" or "based on" implies "exclusivity." *Id.* at 1149-50. Therefore, "neither the dictionary definitions nor the common understanding of the phrase 'based on' suggest that Lincoln Benefit is prohibited from considering factors beyond sex, issue age, policy year, and payment class when calculating its COI rates." *Id.* at 1150. The Seventh Circuit also noted that (1) the policy included a table

of "guaranteed maximum rates" and (2) it was undisputed that "Norem's COI rates have remained unchanged and have also never exceeded these guaranteed maximums." *Id.*

According to the Seventh Circuit, the policy's COI rate provision "is most reasonably read as a *description* of those components of the COI rate relevant to an individual insured." *Id.* at 1152. The Seventh Circuit remarked that it was industry practice for insurers to consider numerous factors in setting COI rates, and that the specifics of Lincoln's formula were proprietary and not disclosed to policyholders. *Id.* at 1150. The Court stated it was "logical" the policy would spell out factors specific to the insured without providing a precise list of all factors it would consider. *Id.*

The Court also observed that the sentence immediately after the "based on" clause states that "[t]he rates will be determined by us but they will never be more than the guaranteed rates shown on Page 5." *Id.* The Court reasoned that "[t]his sentence makes clear that Lincoln Benefit will utilize its own formula to determine the rates, subject to the limitation that they cannot exceed the guaranteed maximum rates." *Id.* It determined that interpreting the "based on" provision "as informational gives meaning to the provision as a whole." *Id.*

Additionally, the Seventh Circuit concluded that "the only express limitation is found in the explicit guarantee that the COI rates never be more than the listed maximum rates." *Id.* To the Court, the policy was best read as containing two parts: "first, an explanatory clause listing key components of the COI rate; and

20                          Opinion of the Court                          22-12991

second, a guaranteed rate that allows a policyholder to see the maximum COI charge that could be deducted from his policy value." *Id.*

The Seventh Circuit also distinguished other district court cases involving a "based on" clause that referred to "mortality experience" and a lawsuit focused on "an increase" in COI rates despite declining mortality. *Id.* at 1153-54. Plaintiff Norem had not claimed or demonstrated that the insurer's COI rates "are 'utterly divorced' from mortality." *Id.*

Ultimately, the Seventh Circuit found "the reasoning of the cases advanced by Lincoln Benefit" convincing. *Id.* at 1155. The Seventh Circuit said: "These cases hold generally that absent a promise to use a specific formula when calculating a COI rate, an insurer is not bound to consider *only* those factors listed in a COI provision." *Id.* The Seventh Circuit concluded that "[t]his interpretation comports with the common understanding of the phrase 'based on' and is also the most reasonable way to construe the language of the COI provision as a whole." *Id.*

After *Norem*, the Eighth Circuit in *Vogt* disagreed with the Seventh Circuit. So we review *Vogt*.

### D.    *Vogt v. State Farm Life Ins. Co.* (**8th Cir. 2020**)

In *Vogt v. State Farm Life Insurance Co.*, the Eighth Circuit concluded "based on" was ambiguous, should be construed against State Farm, and read to imply exclusivity of the listed factors. 963 F.3d at 761-64 (applying Missouri law). Once again, the policy terms were the crux of the lawsuit.

22-12991          Opinion of the Court          21

In 1999, Vogt purchased his life insurance policy, but surrendered it in 2013 for its policy value. *Id.* at 761. Dissatisfied with the COI fees, Vogt brought breach of contract and conversion claims as part of a class action. *Id.* Vogt alleged State Farm used non-listed, non-mortality related factors to calculate its COI rate. *Id.*

State Farm's policy allowed monthly deductions for "(1) the cost of insurance, (2) the monthly charges for any riders, and (3) the monthly expense charge." *Id.* The COI rate provision stated:

> [The Monthly Cost of Insurance] rates for each policy year are <u>based on the Insured's age on the policy anniversary, sex, and applicable rate class</u>. A rate class will be determined for the Initial Basic Amount and for each increase. The rates shown on page 4 are the maximum monthly cost of insurance rates for the Initial Basic Amount. Maximum monthly cost of insurance rates will be provided for each increase in the Basic Amount. We can charge rates lower than those shown. <u>Such rates can be adjusted for projected changes in mortality but cannot exceed the maximum monthly cost of insurance rates</u>. Such adjustments cannot be made more than once a calendar year.

*Id.* Vogt claimed State Farm (1) may set its COI rates based on the enumerated mortality factors of age, sex and rate class but (2) breached its policy by "using non-enumerated factors unrelated to a policyholder's mortality risk," that "included taxes, profit

assumptions, investment earnings, and capital and reserve requirements." *Id.* Because State Farm included non-mortality factors in its COI rates, Vogt asserted that "State Farm deducted from the monthly premium payments more than what the policy stated would be included in the COI fees." *Id.*

The district court granted plaintiff Vogt's motion for summary judgment as to liability, concluding the policy was ambiguous and should be construed against State Farm. *Id.* at 761-72. After a trial as to damages, a jury returned a $34 million verdict in the plaintiff class's favor. *Id.* at 761. State Farm appealed.

Applying Missouri law, the Eighth Circuit affirmed the summary judgment grant and the damages verdict in favor of the plaintiff class, and held that, "at the very least the phrase ['based on'] is ambiguous." *Id.* at 763. The Eighth Circuit explained that the policy "contains no definition for the phrase 'based on,' so we rely on the plain and ordinary meaning of the phrase." *Id.* As opposed to dictionary definitions, the Court relied on how a reasonable person would read the policy language, concluding:

> [A] person of ordinary intelligence purchasing an insurance policy would not read the provision and understand that where the policy states that the COI fees will be calculated "based on" listed mortality factors that the insurer would also be free to incorporate other, unlisted factors into this calculation.

22-12991                Opinion of the Court                23

*Id.* at 763-64.  The Eighth Circuit noted that the Seventh Circuit's *Norem* (1) concluded "based on" did not imply "exclusivity of factors" but (2) "acknowledge[d] that other courts have reached the opposite conclusion." *Id.* at 764.  The Eighth Circuit stated that the fact that several courts "have examined the issue in very similar circumstances and have reached differing conclusions supports the conclusion that the phrase is ambiguous." *Id.*

The Eighth Circuit observed that State Farm was free to draft the policy language to unambiguously give it the freedom to collect a COI fee based on unenumerated factors, but it did not. *Id.* The Eighth Circuit concluded that "the phrase 'based on' in the COI provision is at least ambiguous and thus must be construed against State Farm." *Id.*[3]

In addition to addressing COI rates, these circuit court decisions illustrate the importance of contract interpretation principles.  We now set forth South Carolina's contract law.

## IV.    SOUTH CAROLINA LAW

Courts in South Carolina "have a long history of formalistic interpretation with respect to all contracts and have repeatedly held that the '[i]nsurance policies are subject to general rules of

---

[3] Johnson cites *Mirkin v. XOOM Energy, LLC* to support his argument that the "will be . . . based on" language creates a duty to change rates. *See generally* 931 F.3d 173 (2d Cir. 2019).  Besides not involving a life insurance policy, *Mirkin* is inapplicable because it was not disputed that the consumers had to pay a variable rate for energy purchases and that XOOM had an ongoing contractual duty to base its variable rates on supply costs. *See id.* at 175–77.

contract construction.'" *Bell v. Progressive Direct Ins. Co.*, 757 S.E.2d 399, 406 (S.C. 2014) (quoting *Gambrell v. Travelers Ins. Cos.*, 310 S.E.2d 814, 816 (S.C. 1983)). Contract language in an insurance policy must be given its plain and ordinary meaning. *Williams v. Gov't Emps. Ins. Co.*, 762 S.E.2d 705, 709-10 (S.C. 2014); *Bell*, 757 S.E.2d at 406; *Sloan Constr. Co. v. Cent. Nat'l Ins. Co. of Omaha*, 236 S.E.2d 818, 819 (S.C. 1977). "Where the contract's language is clear and unambiguous, the language alone determines the contract's force and effect." *Williams*, 762 S.E.2d at 709 (quoting *McGill v. Moore*, 672 S.E.2d 571, 574 (S.C. 2009)).

When a policy does not define a term, South Carolina courts consider dictionary definitions as helpful tools to ascertain its plain, ordinary, and common meaning. *See Super Duper Inc. v. Pa. Nat'l Mut. Cas. Ins. Co.*, 683 S.E.2d 792, 796 (S.C. 2009); *Barkley v. Int'l Mut. Ins. Co.*, 86 S.E.2d 602, 604 (S.C. 1955); *S.C. Farm Bureau Mut. Ins. Co. v. Oates*, 588 S.E.2d 643, 646 (S.C. Ct. App. 2003).

"The *construction* of a clear and unambiguous contract is a question of law for the court to determine." *Williams*, 762 S.E.2d at 710. It is also "a question of law for the court whether the language of a contract is ambiguous." *Id.* (quoting *S.C. Dep't of Nat. Res. v. Town of McClellanville*, 550 S.E.2d 299, 302-03 (S.C. 2001)); *McGill*, 672 S.E.2d at 574.

An insurance contract is read as a whole document so that one may not create an ambiguity by pointing out a single sentence or clause. *Schulmeyer v. State Farm Fire and Cas. Co.*, 579 S.E.2d 132, 134 (S.C. 2003) (quoting *Yarborough v. Phx. Mut. Life Ins. Co.*, 225

S.E.2d 344, 348 (S.C. 1976)); *McGill*, 672 S.E.2d at 574. "Whether a contract is ambiguous is to be determined from examining the entire contract, not by reviewing isolated portions of the contract." *Williams*, 762 S.E.2d at 710. "The meaning of a particular word or phrase is not determined by considering the word or phrase by itself, but by reading the policy as a whole and considering the context and subject matter of the insurance contract." *Schulmeyer*, 579 S.E.2d at 134; *Yarborough*, 225 S.E.2d at 349.

A contract "is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Williams*, 762 S.E.2d at 710 (quoting *Hawkins v. Greenwood Dev. Corp.*, 493 S.E.2d 875, 878 (S.C. Ct. App. 1997)).

"If the court decides the language is ambiguous, however, evidence may be admitted to show the intent of the parties, and the determination of the parties' intent becomes a question of fact for the fact-finder." *Id.* (citing *Hawkins*, 493 S.E.2d at 878-79). "Ambiguous or conflicting terms in an insurance policy must be construed liberally in favor of the insured and strictly against the insurer." *Id.* (quoting *Diamond State Ins. Co. v. Homestead Indus., Inc.*, 456 S.E.2d 912, 915 (S.C. 1995)). For ambiguous contracts, "[c]ourt[s] will look to the reasonable expectations of the insured at the time when he entered into the contract." *Bell*, 757 S.E.2d at 407.

If a form insurance contract is ambiguous, *contra proferentem*, which construes ambiguity against the drafter (*i.e.*, the insurer), applies as a rule of last resort. *Williams,* 762 S.E.2d at 710; *Waters v. S. Farm Bureau Life Ins. Co.*, 617 S.E.2d 385, 388 (S.C. Ct. App. 2005) ("After a consideration of extrinsic evidence, the jury is to resolve all remaining ambiguity in favor of the insured.").

We now apply South Carolina law to Johnson's policy.

## V.    ALLEGED DUTY AS TO COI RATES

The first issue is whether after initially setting its monthly COI rate scale in 1988 to cover the life of Johnson, Protective had a contractual duty or obligation to reassess and redetermine that COI rate scale during the Class Period, when by 2012 nationwide mortality had improved.

Johnson contends this sentence, in the middle of one of the three COI rate sections, imposed that requirement: "Monthly cost of insurance rates will be determined by us, based on our expectations as to future mortality experience." Johnson argues that the "will be determined" phrase obligates Protective to reassess and recalculate its monthly COI rates when mortality risks significantly improve. He claims that "will" is a mandatory, not permissive word and creates a contractual command. Johnson distinguishes "will" from "may" and "might."

As to time of performance, Johnson asserts this contractual duty applies "as often as every month," but, at a minimum, "periodically," and those "precise intervals at which Protective's COI rates 'will be determined'" are a fact question. Johnson

submits that we "need not reach the issue of how frequently this periodic duty arises," but must decide at this stage only that such a contractual duty exists.

Protective replies that Johnson reads the "will be determined" phrase in isolation and out of context. Protective asserts that phrase, read with the rest of the sentence, the entire paragraph, and the policy as a whole, merely acknowledges Protective's ability or capacity to choose its monthly COI rates in the future. Protective contends the policy leaves it to Protective to determine whether and when to change its monthly COI rates in the future, subject to the requirement that "any change" not exceed the guaranteed maximum monthly COI rates in Johnson's policy's Table. Indeed, those guaranteed maximum monthly COI rates (1) are listed in great detail in the policy's monthly COI rate Table, (2) thoroughly covered the life of Johnson specifically for each year from age 0 to 94, and (3) thus are known by him as the policyholder at inception.

Regarding the "will be determined" phrase, both parties cite pieces of dictionary definitions of "will." Our review of them reveals "will" has more than one ordinary or common meaning, making context key to our contract interpretation.[4]

---

[4] "Many words have more than one ordinary meaning. The fact is that the more common the term . . . the more meanings it will bear." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 70 (2012).

For example, the American Heritage Dictionary defines "will" as (1) "[u]sed to indicate simple futurity" and (2) "[u]sed to indicate capacity or ability," but also as (3) "[u]sed to indicate requirement or command." *Will*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE ONLINE, https://perma.cc/YUU5-SULL.

Merriam-Webster defines "will" as (1) "used to express futurity" and (2) "used to express desire, choice, willingness," but also as (3) "used to express a command, exhortation, or injunction." *Will*, MERRIAM-WEBSTER ONLINE, https://perma.cc/S2BB-BV6G.

Webster's Third New International Dictionary defines "will" as (1) "used to express capability or sufficiency" but also as (2) "used to express a command, exhortation, or injunction." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2616-17 (3rd ed. 1961).

Webster's New World Dictionary, from 1988, defines "will" as (1) "used to express expectation or surmise" and (2) "used to express possibility," but also as (3) "used to express determination, compulsion, or obligation." WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN ENGLISH 1528 (3d ed. 1988).

The Oxford English Dictionary defines "will" as (1) "[e]xpressing potentiality, capacity, or sufficiency: can, may, be able to, be capable of ——ing," but also as (2) "[e]xpressing determination, wish, or intention to bring about some action, event, or state of things in the future: intend to, mean to." *Will*,

OXFORD ENGLISH DICTIONARY ONLINE, https://perma.cc/BNY6-EHMR.

When common words, like "will," have different meanings, courts "must use the context in which a given word appears to determine its aptest, most likely sense." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS Appendix A, 418 (2012). In the same vein, South Carolina law provides that the meaning of a word is not always determined by the word alone, but "by reading the policy as a whole and considering the context and subject matter" of the policy. *Schulmeyer*, 579 S.E.2d at 134.

Accordingly, let's consider the phrase in the context of the complete sentence. The sentence broadly leaves the monthly COI rate to be determined in the future "<u>by us</u>" (Protective) based on "<u>our expectations</u>." (Emphasis added.) This surrounding language does not bespeak a mandatory obligation to another party. In this context, "will" seems to be used as merely a future tense verb as to what Protective may choose to do in the future.[5]

---

[5] Johnson, quoting § 27.3(b) of Bryan Garner's *The Redbook*, argues that "[g]enerally speaking, contractual promises are well expressed with *will*." However, the topic of § 27.3(b) is entitled the "*Ambiguous 'shall*,'" and § 27.3(b) explains how "contracts often use the word [shall] in as many as four or five different senses." BRYAN GARNER, THE REDBOOK: A MANUAL ON LEGAL STYLE 562, § 27.3(b) (4th ed. 2018). Section 27.3(b) reviews how "[s]ometimes its sense is indeed mandatory"; "sometimes it means 'may'"; and "sometimes it is merely a future-tense verb." *Id*. The same can be said for "will."

An examination of the entire paragraph yields this meaning too.  The very next sentence states: "Any change in the monthly cost of insurance rates will be on a uniform basis for insureds of the same class such as age, sex, rate class, and policy year." (Emphasis added.)  "Any change" suggests no change is required by Protective, but is possible in the future.  And the inclusion of the "uniform basis" term is informative.  If the policy language in the first sentence was a mandatory contractual command, then all such life policies had that obligation and there would be no need for that "uniform basis" term.  On the other hand, if Protective has the ability or choice to make a "change" in its internal COI rates, it will do so uniformly for other insureds with the same age, sex, rate class, and policy year.  The need for this uniformity clause makes more sense if Protective has the ability, not a mandatory obligation, to reassess and "change" its internal COI rates set at inception.

This reading of the "will be determined" phrase is reinforced by the policy as a whole.  Other provisions set forth highly specific and detailed guaranteed maximum *monthly* COI rates *for the life of Johnson from age 0 to 94*.  In contrast, Johnson's isolated relied-upon sentence does not contain a formula or table for calculating COI rates in the future.  The most reasonable reading of that sentence in context is that Protective has the capacity, ability, choice, or possibility to determine its internal COI rates in the future, as long as it does not exceed that guaranteed maximum monthly COI rate.

Tellingly too, the "will be determined" sentence omits any clue as to when the alleged mandatory duty to reassess internal COI rates would have to be performed. Even Johnson acknowledges that his policy does not specify in this isolated sentence, or anywhere else, the precise intervals at which Protective's COI rates will be redetermined; he instead argues "those precise intervals are a fact question."

Although Protective's internal COI rate scale is applied monthly as part of the monthly cost of insurance charge, Johnson is careful not to stress that Protective must redetermine the COI rate each and every month. Think about this though. If this sentence is read, as Johnson suggests, to impose a contractual command "as to the *monthly* COI rate," then that obligation would be monthly. It would not be periodic, *i.e.*, stop one year, skip over a few years, and then start again in the Class Period. The text Johnson relies on does not support Johnson's periodic theory.

For all of these reasons, we are not persuaded that the "will be determined" phrase read in context mandates that Protective, each month or even periodically, reassess and redetermine its internal monthly COI rates set at inception for the life of Johnson.

## VI.    POLICY TERM: "BASED ON"

Alternatively, let's assume that Protective had a contractual duty to reassess and redetermine its COI rate scale each month or periodically. The next question is whether the policy (1) requires Protective to redetermine its monthly COI rates based on *exclusively* its "expectations as to future mortality experience" and

(2) precludes Protective from considering any other factors. Johnson's main theory underlying his breach of contract claim is that (1) "based on" connotes *exclusivity* and (2) Protective breached its contractual duty by not redetermining its monthly COI rates based on *exclusively* its "expectations as to future mortality experience."

As noted above, the circuit courts are split on the meaning of the "based on" term as to COI rates. Some concluded that "based on" does not mean solely or exclusively and granted judgment for the insurance company. *Slam Dunk*, 853 F. App'x at 455; *Norem*, 737 F.3d at 1155; *see also Wilco*, 17 F.4th at 1347; *Thao v. Midland Nat'l Life Ins. Co.*, 549 F. App'x 534, 537 (7th Cir. 2013) (applying *Norem*). These decisions ruled that it is not reasonable to read "only," "exclusively," or "solely" into the term "based on." *Slam Dunk*, 853 F. App'x at 454; *Norem*, 737 F.3d at 1150-51.

The Eighth Circuit, however, determined that "based on" connotes exclusivity, or is "at least ambiguous." *Vogt*, 963 F.3d at 763. The Eighth Circuit construed the term against the defendant insurer and granted judgment in the plaintiff's favor. *Id.*; *see also Meek v. Kan. City Life Ins. Co.*, 664 F. Supp. 3d 923, 933-34 (W.D. Mo. 2023). And some district courts concluded that "based on" is ambiguous and denied an insurer judgment as a matter of law. *See, e.g., PHT Holding II LLC v. N. Am. Co. for Life & Health Ins.*, --- F. Supp. 3d ----, 2023 WL 3714746, at *9-10, 17 (S.D. Iowa May 27, 2023) (summary judgment motion); *Fine v. Kan. City Life Ins. Co.*, 627 F. Supp. 3d 1153, 1158-60 (C.D. Cal. 2022) (motion to dismiss);

*McClure v. State Farm Life Ins. Co.*, 608 F. Supp. 3d 813, 818-22 (D. Ariz. 2022) (summary judgment motion); *see also Fleisher v. Phx. Life Ins. Co.*, 18 F. Supp. 3d 456, 470-74, 479 (S.D.N.Y. 2014) (concluding "based on" connotes exclusivity, or is at least ambiguous, but granting summary judgment to the insurer for other reasons).

Johnson's policy does not define "based on" used in the COI rate section. We thus begin, under South Carolina law, with the term's plain and ordinary meaning. *See Williams*, 762 S.E.2d at 709-10. As discussed above, South Carolina courts consider dictionary definitions to ascertain the plain and ordinary meaning of a term. *See Super Duper Inc.*, 683 S.E.2d at 796; *Barkley*, 86 S.E.2d at 604; *Oates*, 588 S.E.2d at 646. Generally, dictionaries define "base," not "based on," so we start there.

Webster's New Collegiate Dictionary defines "base" as: (1) "a main ingredient"; (2) "a supporting or carrying ingredient"; or (3) "the fundamental part of something." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY, 133 (1986).

Webster's New World Dictionary defines "base" as: (1) "the fundamental or main part" and (2) "the principal or essential ingredient." WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN ENGLISH 114 (3d ed. 1988).

The Oxford English Dictionary defines "base" as: (1) "[a] ground for an action or attitude; an underlying reason or justification" and (2) "[t]he main or most important ingredient or element, to which other things are added or from which another

34                 Opinion of the Court                22-12991

thing is derived." *Base*, OXFORD ENGLISH DICTIONARY ONLINE, https://perma.cc/WA97-ZEFW.

The American Heritage Dictionary defines "base" as "[t]he fact, observation, or premise from which a reasoning process is begun." *Base*, AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE ONLINE, https://perma.cc/D7VC-QT84.

These definitions are consistent with the dictionary entries our Court approved in *Slam Dunk*, which defined "base" as "a main ingredient," "a supporting or carrying ingredient," "the fundamental part of something," "[s]omething on which a thing stands or by which it is supported," and "[t]he principal ingredient, the fundamental element." *See Slam Dunk*, 853 F. App'x at 454-55 (discussing Seventh Circuit's cited dictionary entries in *Norem*); *Norem*, 737 F.3d at 1149 (applying Illinois law); *see also Thao*, 549 F. App'x at 537 (applying Wisconsin law and following *Norem*).

We agree with *Slam Dunk* and *Norem* that "based on" does not mean "exclusively on" or "solely on." Johnson's complaint alleged that Protective's policy required it to base its monthly COI rate "exclusively" or "solely" on its "expectations as to future mortality experience." Because the policy does not have that requirement, the district court did not err in dismissing Johnson's breach of contract claim to the extent it relied on an allegation of "exclusivity."

So far, the above contract issues are premised on Johnson's allegation that Protective did not reassess and redetermine its monthly COI rates "a single time" during the Class Period.

Johnson makes a different allegation for his final breach of contract theory, which we address.

## VII.    IGNORING MORTALITY EXPERIENCE

As his final breach of contact theory, Johnson contends that (1) Protective actually did choose to reassess, and did redetermine, its internal COI rate scale during the Class Period, (2) as to such redeterminations, the policy required Protective to use its "expectations as to future mortality experience," (3) but Protective violated the policy by ignoring its "expectations as to future mortality experience" in making its redeterminations.

Protective responds this breach of contract theory is not properly before our Court. Protective asserts Johnson did not argue this theory below and is precluded from raising it on appeal. *See Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009) (holding legal theories not raised before the district court may not ordinarily be raised for the first time on appeal).

After review, we conclude Johnson did not forfeit this breach of contract theory. Johnson's complaint expressly alleges that during the Class Period, Protective conducted "periodic redeterminations, and continuous mortality review." Despite these redeterminations, Johnson's complaint expressly alleges that his "monthly COI rates have not been determined based on Protective's improving mortality expectations, and the results of Protective's new mortality reviews during the Class Period are being ignored to the detriment [of] the members of the Class." Johnson's complaint also (1) describes his current COI rates as

"wildly divorced from current expectations of future mortality experience" and (2) alleges that Protective's COI rates do not "reflect" its expectations as to future mortality experience.

In reply, Protective emphasizes that at a hearing on its motion, Johnson summarized his case as primarily concerning whether Protective (1) had an ongoing contractual duty "to review and adjust its COI rates" and (2) was contractually permitted to consider factors other than its expectations as to future mortality experience. At the hearing, however, Johnson also made clear that he was asserting a theory of liability "that even if Protective was allowed to consider factors other than expectations of future mortality experience, . . . it did not determine its COI rates in accordance with the contract because it ignored its expectations of future mortality."

The record also shows Johnson stressed this breach of contract theory in his opposition to Protective's motion for judgment on the pleadings and in his post-hearing briefing. For example, Johnson's opposition brief argued that *Slam Dunk* was not dispositive of his breach of contract claim because "allowing Protective to consider factors such as expense and lapse is not the same as allowing Protective to *ignore* the enumerated factors." In post-hearing briefing, Johnson emphasized that the complaint alleges "that Protective *did ignore* its improving mortality expectations and *did not* treat them as the 'main ingredients.'"

After review, we also conclude that Johnson's complaint sufficiently alleges that Protective did redetermine its COI rates but

ignored its "expectations as to future mortality experience" when it did so. While the policy did not require Protective to redetermine its internal COI rates set at inception, that's a separate matter from the issue of what the policy required if Protective chose or elected voluntarily to reassess and change them.

Further, in assessing Protective's contractual duty under the policy, the district court erroneously cabined that duty to whether Protective was obligated to reassess and redetermine its COI rates, as opposed to also what duty Protective had if Protective chose to reassess and did redetermine its COI rates. While Johnson's highlighted sentence in the COI rate section did not mandate a redetermination by Protective, that sentence in context does support Johnson's alternative breach of contract theory that if Protective chose to, and did, redetermine its COI rates, Protective was obligated to consider its "expectations as to future mortality experience."

Given the COI rate section, the district court erred in dismissing Johnson's breach of contract claim to the extent Johnson asserted Protective chose to, and did, reassess and redetermine its COI rate scale during the Class Period, but "ignored" its expectations as to future mortality experience in doing so. As explained above, "based on" means as a main or principal ingredient, and thus Protective could not ignore that factor. While

it remains to be seen what can be proven, at this pleadings stage Johnson's complaint states a breach of contract claim to that extent.

## VIII.    PROPOSED THIRD AMENDED COMPLAINT

Before concluding, we address a procedural issue raised by Johnson as to his proposed third amended complaint. Johnson argues that the district court erred by not "adequately considering" the new factual allegations in 13 new paragraphs of his proposed third amended complaint ("TAC") and by describing it as a "carbon copy" of the complaint. Johnson asserts that the district court incorrectly found his proposed TAC was a futile "carbon copy," and erroneously denied Johnson's request for leave to amend.

Protective responds that Johnson did not file a standalone motion for leave to amend, and thus his request as to the proposed TAC was not properly before the district court. Protective points out that Johnson only requested leave to amend in the last two pages of his brief in opposition to Protective's motion for judgment on the pleadings. Protective asserts the district court "never ruled on the misplaced request that [Johnson] made in [his] opposition."

As background, Johnson's original complaint was filed on August 13, 2018, his first amended complaint on November 19, 2018, and his second amended complaint on June 29, 2020, which was the deadline for any amendments of the pleadings.[6] On June 11, 2021, Protective filed its motion for judgment on the pleadings.

---

[6] The district court had set a May 30, 2020 deadline, but it was extended to June 29, 2020 under the General Orders entered by the Northern District of

On August 4, 2021, Johnson filed his 30-page opposition brief, to which he attached a proposed TAC. His brief asked for leave to amend in the last two pages. Johnson's brief summarily cited Rule 15 and argued he had good cause to amend because (1) Protective raised *Slam Dunk* in June of 2021 and (2) Protective would not be prejudiced. Protective replied that the TAC was futile in any event.

In its order granting Protective's motion for judgment on the pleadings, the district court did not directly address Johnson's request for leave to amend embedded in his brief. Its order mentions Johnson's request in only a footnote, which describes his proposed TAC as a "carbon copy" of the complaint, as follows:

> The factual allegations discussed in this opinion appear in [Johnson's] second amended complaint (Doc. 92), and [Johnson's] proposed third amended complaint, (Doc. 123). The second amended complaint was the operative complaint when Protective Life filed the motion for judgment on the pleadings now before the Court. The proposed third amended complaint is a carbon copy of the second amended complaint with one additional allegation:
>
>> Even if Protective [Life] Were Permitted to Consider Other Unenumerated Factors in Determining COI Rates, It is

Alabama in response to the COVID-19 pandemic. *See* General Order entered Apr. 13, 2020, No. 2020-04 (N.D. Ala.); General Order entered Mar. 17, 2020 (N.D. Ala.).

Still      Dramatically      Overcharging
Policyholders and in Breach of Contract

Other than this observation, the district court's order did not expressly grant or deny Johnson's request for leave to amend embedded in his brief.

On appeal, Johnson emphasizes his proposed TAC was not a "carbon copy," but contained "13 additional, new factual allegations," "spanning seven pages." The district court's order contained parallel citations to paragraphs that were the same in the complaint and the proposed TAC. But there were no citations to the 13 new allegations in the TAC. Thus, the district court's footnote characterizing it as a "carbon copy" was not correct.

Nonetheless, the problem for Johnson is that his request for leave to amend was embedded in his opposition brief and was not properly before the district court. To properly request leave to amend, a plaintiff must satisfy two requirements: (1) file a motion for leave to amend and (2) "['']either set forth the substance of the proposed amendment or attach a copy of the proposed amendment.'" *Cita Tr. Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1157 (11th Cir. 2018) (quoting *Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999)).

In *Long*, "the plaintiff did not file a motion for leave to amend," "[t]he request for leave to amend was included in the memorandum [plaintiff] filed in opposition to the motion to dismiss," and plaintiff "failed to attach the amendment or set forth the substance of the proposed amendment." *Long*, 181 F.3d at 1279.

The *Long* Court explained that "[f]iling a motion is the proper method to request leave to amend a complaint." *Id.* We stressed that Rule 7(b)(1) provides that "[a]n application to the court for an order shall be by *motion* which, unless made during a hearing or trial, shall be made in writing, shall state with particularity the grounds therefor, and shall set forth the relief or order sought." *Id.* (quoting Fed. R. Civ. P. 7(b)(1)). We held that "plaintiff had ample time to file a motion for leave to amend but failed to do so," and "the district court did not abuse its discretion in denying plaintiff leave to amend her complaint." *Id.* at 1279-80.

Our decision in *Newton v. Duke Energy Florida, LLC*, is also instructive. *See* 895 F.3d 1270, 1277 (11th Cir. 2018). Plaintiffs requested leave to amend in their opposition memorandum to defendant's motion to dismiss. *Id.* This Court held that "the request possessed no legal effect for two reasons." *Id.* "First, where a request for leave to file an amended complaint simply is embedded within an opposition memorandum, the issue has not been raised properly." *Id.* (quotation marks omitted and alterations adopted). "Second, a request for a court order must be made by motion." *Id.* (quotation marks omitted and alterations adopted).

Citing Rule 7(b), the *Newton* Court stated the motion must (1) "be in writing unless made during a hearing or trial," (2) "state with particularity the grounds for seeking the order," and (3) "state the relief sought." *Id.* (quotation marks omitted). Our Court held that "[p]laintiffs' inclusion of the request for leave in their

opposition to a motion to dismiss did not constitute a 'motion' and thus did not comply with this Rule 7(b) command." *Id.*

As to this "motion" requirement, our Court recently affirmed a dismissal without leave to amend, relying on a plaintiff's failure to satisfy the first requirement. *Chabad Chayil, Inc. v. Sch. Bd. of Mia.-Dade Cnty.*, 48 F.4th 1222, 1236 (11th Cir. 2022). We held that "[w]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." *Id.* (quotation marks omitted).

That Johnson satisfied the second requirement by filing a proposed TAC does not cure his defect as to the first, especially under the circumstances of this case. On the June 29, 2020 deadline for amendments, Johnson filed a standalone motion for leave to file his second amended complaint, which was granted. It was a year later that Johnson's proposed TAC was attached to his opposition brief and his request for leave to amend came not by motion, but only embedded in that brief. We decline to fault the district court for not expressly ruling on that embedded request by granting or denying it. Rather, we conclude Johnson's request for leave to amend embedded in his opposition brief was not properly before the district court.

Johnson asserts that this first requirement—a motion—is only a question of whether the request for leave to amend in his brief is "the functional equivalent of a motion for leave to amend." (Quotation marks omitted.) We disagree. As outlined above, our precedent is clear that a request for leave to amend embedded in an

opposition memorandum does not properly put the issue before the district court.

Johnson's two cited cases are not on point. *See United States v. HPC Healthcare, Inc.*, 723 F. App'x 783, 793 (11th Cir. 2018); *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1362 (11th Cir. 2006). In both cases, the plaintiff did not file a motion, requested leave to amend in an opposition brief, and failed to attach a proposed amendment or set forth the substance of the proposed amendment. *HPC Healthcare, Inc.*, 723 F. App'x at 793; *Atkins*, 470 F.3d at 1362.

These two cases, however, did not analyze the first requirement of a motion. They bypassed the first requirement and only "assumed" that the plaintiff's request was the functional equivalent of a motion and upheld the district court's denial of leave to amend based on the plaintiff's failure to comply with the second requirement. *HPC Healthcare, Inc.*, 723 F. App'x at 793 (stating our Court in *Atkins* "assumed that a request to amend included in a response to a motion to dismiss (what [plaintiff] did here) is 'the functional equivalent of a motion' for leave to amend"); *Atkins*, 470 F.3d at 1362 ("Therefore, assuming that Atkins's request was the functional equivalent of a motion, we affirm the district court's rejection thereof because it failed to include the proposed amendment or the substance thereof as required by *Long*.").

Based on our search, this Court also bypassed the first requirement in other cases. *See Crawford's Auto Ctr., Inc. v. State Farm*

*Mut. Auto. Ins. Co.*, 945 F.3d 1150, 1163 (11th Cir. 2019) (quoting *Atkins* and "[a]ssuming that [p]laintiffs' requests amount to 'the functional equivalent of a motion,'" but nonetheless still affirming the district court's rejection thereof because plaintiffs failed to include the proposed amendment or the substance thereof); *My24HourNews.com, Inc. v. AT&T Corp.*, 791 F. App'x 788, 803 (11th Cir. 2019) ("Even assuming that request was the functional equivalent of a motion, [plaintiff] failed to attach the proposed amendment or set forth the substance of the proposed amendment, as required by *Long*.").

At bottom, it was unnecessary in these cases to address the first requirement of a motion, where the plaintiff had not satisfied the second requirement of attaching a proposed amendment or stating the substance of the amendment. The obvious (and easiest) route was to rule on only the second requirement.

Here, we face the opposite situation: the plaintiff did not file a motion as required by our precedent and Rule 7(b), but attached a proposed TAC. Our precedent sets forth two separate requirements, and we must, and should, apply them here. *See Long*, 181 F.3d at 1279; *Chabad Chayil, Inc.*, 48 F.4th at 1236; *Newton*, 895 F.3d at 1277-78; *Cita Tr. Co.*, 879 F.3d at 1157. Because Johnson embedded his request in his opposition brief and did not file a motion for leave to amend, Johnson's request for leave to amend was not properly before the district court.

### IX.    CONCLUSION

In sum, we affirm the district court's dismissal of Johnson's breach of contract claim premised on the theory Protective (1) had a contractual duty to reassess and redetermine, monthly or periodically, its COI rates based exclusively on its "expectations as to future mortality experience" (2) but never did so "a single time" during the Class Period.  We affirm that dismissal on two grounds: (1) the policy did not impose that contractual duty and (2) even if Protective had such a contractual duty, Protective was not required to redetermine its monthly COI rates based on *exclusively* its "expectations as to future mortality experience."

We reverse the district court's dismissal of Johnson's breach of contract claim premised on the alternative theory that Protective chose to, and did, reassess, redetermine, and change its internal monthly COI rate scale during the Class Period and violated the policy by ignoring its "expectations as to future mortality experience" when it did so.

Finally, we find no reversible error as to Johnson's proposed third amended complaint because it was not properly before the district court.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**